**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TABUSSUM N. AHMAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 2959** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Daniel G. Martin** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying the claims of Plaintiff Tabassum Ahmad ("Plaintiff") for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, the Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [Dkt. 13] is GRANTED IN PART and DENIED IN PART, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On February 28, 2011, Plaintiff filed claims for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability since January 1, 2009.[1] The claim was denied initially and upon reconsideration, after which she timely requested a hearing before an Administrative Law Judge, which was held on September 18, 2012. Plaintiff personally appeared and testified at the hearing before Administrative Law Judge Joel G. Fina (the "ALJ") and was represented by counsel. Medical experts Dr. Gilberto Munoz and Dr. David Biscardi and vocational expert Aimee Mowery also testified.

---

[1] This Alleged Onset Date ("AOD") reflects that of Plaintiff's current applications. (R. 178, R. 185.) The July 1, 2006 onset date mentioned by Plaintiff in her Memorandum appears to be an erroneous reference to the AOD of earlier applications for benefits dated December 13, 2007. (Pl. Mem. at 3; R. 166, 170.)

On September 4, 2012, the ALJ denied Plaintiff's claims for both Disability Insurance Benefits and Supplemental Security Income, finding her not disabled under the Social Security Act.[2] The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND

### A.    <u>Work and Education</u>

Plaintiff was born on November 26, 1965 and was forty-six years old at the time of the ALJ hearing. She is married and lives with her husband and her adult daughter. She completed more than two years of college education in Pakistan. A United States citizen, she moved to the U.S. in 1983. Here, she has worked as a preschool teacher, a preschool teacher's aide, a home care aide to the elderly, and a hostess/cashier at a restaurant.

### B.    <u>Medical Evidence</u>

Plaintiff stands four feet ten inches tall and weighed 155 pounds in June 2011. She has a history of asthma and hypertension and has at different times been diagnosed with various autoimmune disorders including Sjogren's syndrome,[3] arthritis, lupus, and fibromyalgia. She has also experienced depression and anxiety, first as a result of her physical ailments then sharply increasing with grief stemming from the accidental drowning death of her nine-year-old daughter in 2008. Additional stressors have included her teenaged son's serious mental illness, her husband's depression, and family financial strain due to the loss of some of her husband's businesses. She has also experienced sleep disturbances.

---

[2] The standard for determining "disability" for supplemental security income ("SSI") is "virtually identical" to that used for disability insurance benefits ("DIB"). *Hankerson v. Harris,* 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case.") For the sake of convenience, this Court shall consider Plaintiff's DIB and SSI claims concurrently. Further, the Court cites to both DIB and SSI cases.
[3] Sjogren's syndrome is an immune syndrome disorder that is characterized by dry eyes and a dry mouth. It often accompanies other immune system disorders such as rheumatoid arthritis and lupus. http://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/basics/definition/con-20020275 (last visited December 17, 2015).

Treatment records dating from 2007 through early 2012 indicate that Plaintiff has received regular primary care from Edwards Medical Group and regular rheumatology care from Dr. Elena Gogoneata, and that she had ten psychotherapy sessions for severe depression and grief at Samaritan Interfaith in January-April 2009. (R. 585, 816-830). On September 25, 2009, Plaintiff was admitted to Edwards Hospital with chest pain. She was given a chest scan, an echocardiogram, and a stress test; all results were normal. (R. 469-479).

Though Plaintiff has provided no Medical Source Statement (MSS) from any treating physician, the record contains reports from several consulting physicians as to Plaintiff's mental and physical health. Psychological Consultant Kelly Renzi, Psy. D. met with Plaintiff on June 1, 2011. (R. 586-590). In her report, Dr. Renzi noted that Plaintiff experienced significant psychosocial stressors, including the death of her daughter, and described Plaintiff's medical and social history. At the meeting, Plaintiff manifested a depressed mood but reported no suicidal ideations and no delusions or hallucinations. She was alert, oriented, and had no difficulty understanding directions, but her memory and concentration were below average. She could not recall any of a list of four words after a twenty minute delay. (R. 588). Dr. Renzi diagnosed Plaintiff with a nonspecified depressive disorder and indicated that she had a Global Assessment of Functioning (GAF) score of 60.[4] (R. 586-589).

Dr. Terry A. Travis M.D. completed a Psychiatric Review Technique on June 10, 2011 based on a letter submitted by Plaintiff's therapist at Samaritan Interfaith, the report of Dr. Renzi, and the function reports completed by the Plaintiff and her daughter. (R. 606). He stated that Plaintiff has a nonspecified depressive disorder. (R. 599). He noted that function reports indicate that Plaintiff is able to do chores, prepare meals, take care of finances, and attend to personal hygiene and take medications without reminders or assistance. (R. 606). He opined

---

[4] Although the GAF is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, No. 14 C 3833, 2015 WL 7180092 at *1 (N.D. Ill. Nov. 16, 2015). The lower the score, the greater the degree of impairment. *Id*. A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id*. Anything above 60 would indicate mild symptoms. *Id*.

that she has moderate limitations in her activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and mild difficulties in maintaining social functioning, with no episodes of decompensation. In a Mental Residual Functional Capacity Assessment completed that same day, Dr. Travis opined that Plaintiff is moderately limited in her ability to maintain attention and concentration for extended periods and moderately limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms. (R. 610-611). Dr. Travis also indicated that there is no evidence of limitation, or no significant limitation, in any other area of mental functioning. (R. 610-611). In his notes, he reported that most of Plaintiff's limitations are related to physical constraints, and opined that she can learn instructions, do multistep tasks in a routine work setting, relate appropriately, adapt to circumstances, and function consistently at a reasonable rate within a schedule. (R. 612).

With respect to her physical ailments, on June 8, 2011, Plaintiff met with consultative examiner Ravikiran N. Tamragouri, M.D., who examined her and submitted a report in connection with her application for disability benefits. She demonstrated a full range of motion everywhere except in the external rotation of the right hip, which was 30/50; and in the lumbar spine, where her range of extension and left and right lateral bending were just 15/25, and her range of flexion was 80/90 with pain. She was able to get up from a chair and climb on to an examining table without assistance. Her breathing, pulses, gait, and mental status were normal. She had muscle strength of 5/5 and grip strength of 4/5 in both the left and right hands, a decreased sense of touch in the left hand, and some dimpling in the skin on her forearm. Dr. Tamragouri noted Plaintiff's hypertension, asthma, history of Sjogren's and myofascial pain,[5] history of joint pain (arthralgia) that could be due to Sjogren's or arthritis, history of seasonal allergies, and history of heavy menstrual bleeding (menorrhagia.) (R. 591-594).

---

[5] "Myofascial pain syndrome is a chronic pain disorder. In myofascial pain syndrome, pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body. This is called referred pain." http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195 (visited December 17, 2015).

Medical Consultant Dr. Bharati Jhaveri M.D. completed a Physical Residual Functional Capacity Assessment on June 13, 2011. (R. 614-621). Dr. Jhaveri opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, with no restrictions on pushing or pulling. As to postural capacity, she opined that Plaintiff could occasionally balance, kneel, crouch, or crawl, but she did not offer an opinion as to Plaintiff's abilities to stoop or climb. She further opined that Plaintiff's ability to engage in handling and fingering (gross and fine manipulation) would be limited to frequently, because of her reduced grip strength. Dr. Jhaveri based her assessments on med Plaintiff's medical record, including the evidence describing her gait, ranges of motion, and muscle strength. (R. 615-617). She also cited medical evidence showing that Plaintiff's hypertension is well-controlled with no evidence of end organ damage. (R. 614). She opined that Plaintiff would be subject to just one environmental limitation, the need to avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation, because of her history of seasonal allergies and "very well-controlled" asthma. (R. 618). Finally, with respect to the severity of symptoms, Dr. Jhaveri opined that Plaintiff's symptoms were attributable to a medically determinable impairment, but that reports of limitations in lifting, reaching, walking, seeing, and stair climbing were only "partially credible in light of the overall medical evidence."

At her hearing before the ALJ, two medical experts testified as to Plaintiff's physical and mental health. Dr. Gilberto Munoz, a physician specializing in family practice and occupational medicine, testified that Plaintiff has asthma, hypertension, Sjogren's, arthritis, and a history of fibromyalgia and sleep disorders. She also has some evidence of immunological disease that can accompany arthritis. Dr. Munoz testified that, while lupus is a complex diagnosis, Plaintiff has some positive immunological evidence, including testing positive for antinuclear antibodies (ANA), but not all of the symptoms of lupus. He noted that there is less evidence of sarcoidosis. (R. 43-44). Dr. Munoz further testified that the record did not show sufficient documentation to

confirm a diagnosis of fibromyalgia according to the "new document regarding fibromyalgia… [in] the Federal Register."[6] *(R. 45).*

When questioned about Plaintiff's asthma, Dr. Munoz noted that a pulmonary function test in February 2010 was within a normal range. When asked whether Plaintiff's hypertension results in any end-organ damage, Dr. Munoz responded that a March 2010 echocardiogram was normal. Dr. Munoz acknowledged that Plaintiff has Sjogren's syndrome and noted that it is not typically severe, and that Plaintiff is being treated for the resulting dryness of the mouth and eyes. Dr. Munoz indicated that the record indicated no sleep study to diagnose a sleep disorder. (R. 46-47). Dr. Munoz then opined that Plaintiff's medical impairments, individually or in combination, do not meet any listing. He indicated that he had looked at asthma (Listing 3.03) as well as hypertension and musculoskeletal functions. He opined that she would be limited to sedentary work with certain restrictions. (R. 48).

Dr. David Biscardi, psychologist, also testified at the hearing. He stated that the records indicated the presence of a depressive disorder and a grief reaction with anxiety, as well as symptoms associated with depression: sleep disturbance, appetite disturbance, and anhedonia. However, he stated that Plaintiff did not meet or equal Listing 12.04, because her mental impairment causes only a mild limitation in her activities of daily living and a moderate limitation in social functioning and a moderate limitation in concentration, persistence and pace, with no clear episodes of decompensation. He opined that the C criteria were inapplicable. (R. 51-52). Dr. Biscardi further testified that Plaintiff's mental health impairments would cause moderate limitations in her ability to function in a work setting, precluding contact with the public or work in a fast-paced production environment. He stated that she retains the capacity to have brief and superficial interactions with coworkers and supervisors; to understand, remember, carry out, and sustain performance of one to three-step tasks; and to complete a normal work day and adapt appropriately to stresses associated with simple, routine tasks. (R. 52-54).

### C.    **Plaintiff's Testimony**

---

[6] Social Security Ruling 12-2p, published on July 25, 2012, provides guidance on how the Social Security Administration determines that someone has a medically determinable impairment of fibromyalgia.

Plaintiff testified that she previously worked as a teacher's assistant at Kindercare. She wanted to work full time but her physical ailments prevented that. Her last full-time job was as a preschool teacher to three-year olds, a job she characterized as requiring a great deal of responsibility with children. The job also required her to be up on her feet walking all day, and involved lifting children who weighed 25-30 pounds. She had also worked as a home care aide to the elderly and, earlier, as a hostess and cashier at a restaurant, which required no lifting but involved being on her feet for eight hours a day. (R. 56-59).

Plaintiff testified that she can no longer work because of excessive absenteeism caused by her illnesses, including bad allergies, blistering and rashes in the sun, and fibromyalgia pain. She said she does not drive because she's a bad driver. At home, she cooks occasionally, but her daughter does most of the housework. During the day, she feels sleepy because she has trouble sleeping at night. She used to read a lot of books but avoids reading now because of the dryness in her eyes caused by Sjogren's. She chats with friends or family when they call or visit. She testified that she can stand or walk for ten or fifteen minutes before tiring, and that she can lift perhaps five pounds, but cannot lift a gallon of milk or juice. (R. 60-64).

Plaintiff explained that she has traveling pain that occurs every day but changes location. She has taken medications but experiences intolerable side effects including drowsiness and upset stomach, and doctors change her medicines frequently. She has taken prednisone, which helps with movements and joint pain and breathing but causes swelling and depression and anxiety. She takes Xanax, which helps her sleep for a few hours. She feels impaired from doing things she wants to do and is unable to focus. (R. 64-69). She forgets things, and her daughter reminds her when to take her medicine and even when to eat. (R. 70). Her rheumatologist has told her not to work because of her chronic condition. (R. 71).

### D. Vocational Expert Testimony

The ALJ asked Vocational Expert ("VE") Aimee Mowery to consider a hypothetical person with the same age, education, and work experience as Plaintiff, who is able to perform sedentary work limited to simple, routine, and repetitive tasks in a work environment which

would have no strict production rate requirements, no interaction with the public during work activities and only brief and superficial interactions with coworkers and supervisors; who can lift ten pounds occasionally, frequently push or pull, only occasionally operate foot controls, never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs; who can occasionally balance, stoop, crouch, kneel or crawl; who can frequently but not constantly reach bilaterally and handle or finger objects; and who must avoid concentrated exposure to pulmonary irritants, all exposure to unprotected heights, and all commercial driving. The VE opined that the person could not perform any of Plaintiff's past work, but that the individual could perform other jobs, including but not limited to sorter (1,000 jobs in the region), hand packager (1,300 jobs in the region), and inspector (1,800 jobs in the region). (R. 76).

The ALJ further hypothesized an individual with the same restrictions as the first, with the additional limitation that the person would need to avoid even moderate exposure to direct sunlight. The ALJ noted that, while a person might be exposed to sunlight going to and from the work place, it was "not typical" for a sorter, hand packager, or inspector to be exposed to direct sunlight in the workplace. She opined that, with precautions coming and going to the work site, those jobs could be performed even with the additional limitation. (R. 77-78).

## E.    ALJ Decision

At step one of his analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her onset date of January 1, 2009. At step two, the ALJ concluded that Plaintiff had severe impairments of asthma, hypertension, arthritis, history of fibromyalgia, lupus with positive antibody, sarcoidosis, and depressive disorder with anxiety reaction. The ALJ concluded at step three that the impairments, alone or in combination, do not meet or medically equal a listing. The ALJ then determined that Plaintiff retained the Residual Functional Capacity ("RFC") to perform sedentary work limited to simple, routine, and repetitive tasks in a work environment which would have no strict production rate requirements, no interaction with the public during work activities and only brief and superficial interactions with coworkers and supervisors; that she could push or pull only on a frequent basis, only occasionally operate foot controls, never climb ladders, ropes, or scaffolds; that she could occasionally climb ramps or stairs and occasionally balance, stoop, crouch, kneel or crawl; that she could frequently but not constantly reach bilaterally and handle or finger objects; and that she must avoid exposure to extreme temperatures, concentrated exposure to pulmonary irritants, all exposure to unprotected heights, and all commercial driving. The ALJ concluded at step four that, given those restrictions, Plaintiff could not perform her past relevant work. At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff can perform jobs existing in significant numbers in the national economy, leading to a finding that she is not disabled under the Social Security Act.

## DISCUSSION

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in

order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.   JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ

denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."); *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014) (disapproving of "cherry-picking" evidence).

## III. ANALYSIS

### A. Credibility

Plaintiff challenges the ALJ's finding that her testimony was not fully credible. Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (when considering an ALJ's credibility finding, courts do not review the medical evidence *de novo* but "merely examine whether the ALJ's determination was reasoned and supported"). In assessing a claimant's credibility, an ALJ must first determine whether the symptoms she reports are supported by medical evidence. SSR 96–7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96–7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements

about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822-823. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 774-775 (7th Cir. 2004).

The lack of objective evidence is not by itself reason to find a claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). When evaluating a plaintiff's credibility, the ALJ must also consider A(1) the claimant=s daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.@ *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see* SSR 96-7p at *3. An ALJ must give specific reasons for discrediting a claimant=s testimony, and A[t]hose reasons must be supported by record evidence and must be >sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual=s statements and the reasons for that weight.=@ *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88); *see* SSR 96-7p.

First, the ALJ errs in his characterization of Plaintiff's daily activities. Although it is certainly appropriate to consider an individual's activities of daily living in assessing credibility, this must be done with care, taking into consideration the limitations with which a claimant performs those activities. SSR 96-7p; *Roddy v. Astrue,* 705 F.3d at 639. *Moss v. Astrue,* 555 F.3d 556, 562 (7th Cir. 2009). Because a person has "more flexibility in scheduling" household tasks and "is not held to a minimum standard of performance, as she would be by an employer," completion of some household tasks cannot be equated with the ability to sustain a full-time job. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Here, the ALJ stated that Plaintiff can "cook [and] do chores such as ironing, doing the laundry, and cooking occasionally." (R. 27). While her testimony and function reports did mention these activities, they also indicate significant limitations. She testified that she needs help loading and unloading the laundry machines, cutting food, and changing sheets. (R. 63, 67, 276). She stated that her daughter

does most of the housework. (R. 61). While Plaintiff joins her daughter in the kitchen and helps her cook family meals, her daughter does the actual cutting and cooking. (R. 67). Otherwise Plaintiff is limited to feeding herself simple foods like tea, toast, and boiled eggs. (R. 61, 69). The ALJ wrote that Plaintiff can "drive and go out alone," when in fact she reported that she only goes out with her husband, and then only as necessary to go to doctors' appointments or places where the whole family is going. (R. 28, 277-278). She holds a driver's license but rarely actually drives any more. (R. 60-61.) Together, the Plaintiff's reported activities hardly suggest that she can work full time.

The ALJ also fails to explain why Plaintiff's statements regarding the limiting effects of her pain are not credible. Even with Cymbalta, the Plaintiff testified that her pain is five or six out of ten; the ALJ described that level of pain control as "good." (R. 28). It is not clear why an individual who has a pain level of 6/10 can have her credibility dismissed in the conclusory manner that the ALJ said it could. Plaintiff does not allege she is paralyzed by pain; she essentially claims that her pain prevents her from working on a full time basis. The ALJ failed to draw any bridge from Plaintiff's reported pain level to his conclusion that she could work the eight hours a day, five days a week or equivalent schedule necessary to be considered "not disabled" under the rules of the Social Security Administration. SSR 96-8p. At a minimum, the ALJ was obligated to explain his reasoning before dismissing what appears to be a significant amount of pain as "good." Further, his reliance on certain aspects of Plaintiff's medical exams is misplaced. He noted, for example, that exams showed that she had a normal gait, could get up and down from an exam table, had no major joint abnormalities, and had mostly normal ranges of motion. (R. 28). The problem with citing this evidence to undermine Plaintiff's credibility is that she never said she lacked a normal gait or range of motion. She stated that she was seriously hindered by pain and stiffness. An ALJ must explain how a claimant's testimony or demeanor during the hearing contradicts his claim. *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir.2000), *Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir.2005) ("an ALJ [must] articulate specific reasons for discounting a claimant's testimony as being less than credible."); SSR 96–7p

(stating "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision."). Here, the ALJ failed to explain why he thought that the evidence he cited actually related to the symptoms and restrictions that Plaintiff claims.

In assessing Plaintiff's credibility, it does not appear that the ALJ considered most of Plaintiff's testimony regarding her medications. Indeed, except for his comments about Cymbalta, the ALJ failed to mention Plaintiff's medications at all. In her testimony, she indicated that she has side effects from many of her medications that cause her to change medications or reduce doses frequently. (R. 65-67). She described side effects including upset stomach and sun sensitivity from the lupus medication Plaquenil,[7]and stated that prednisone has caused serious side effects including swelling, depression, and anxiety. (R. 66-68). She noted that Lyrica makes her "very drowsy and confused." (R. 281).She testified that she takes Xanax to relax, but that while taking it she is unable to focus. (R. 68). The ALJ neither acknowledged this testimony nor considered it in evaluating whether her allegations of symptoms are credible.

Nor did the ALJ adequately explain his reasoning regarding the aggravating effects of Plaintiff's sleep disturbances. He simply discounted Plaintiff's credibility on this point because "no documented sleep study" confirmed her allegations of a sleep impairment. That is insufficient to reject her credibility. A claimant's "testimony cannot be disregarded simply because it is not corroborated by objective medical evidence." *Hill v. Colvin*, No. 15-1230, 807 F.3d 862, -- (7th Cir. 2015) (citations omitted). Plaintiff testified at her hearing that she has trouble sleeping at night and is sleepy during the day. (R. 62, 66). She has made similar reports to her doctors at various times (R. 818-819, 821, 824). The ALJ cannot dismiss the Plaintiff's testimony and her reports to her doctors solely because there is no sleep study to confirm her allegations. If he finds her testimony about the limiting effects of her sleep problems not credible, he must explain why and support his findings with evidence from the record.

---

[7] Plaquenil has been associated with sun sensitivity.
http://arthritis.about.com/od/arthritismedications/a/sun_sensitivity.htm (last visited 12/28/2015).

Because the errors and omissions discussed, the ALJ failed to build an accurate logical bridge between the record and his conclusions regarding credibility. Plaintiff's motion to remand is granted on the credibility issue.

**B.      Listings for Autoimmune Disorders and Mental Disorders**

Plaintiff alleges that the ALJ erred in his step three determination that her impairments do not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (individually, "Listings"). She contends that the ALJ erred in basing his conclusions on the testimony of the medical experts who testified at the hearing, "almost to the exclusion of references to other medical evidence." (Mem. at 6). She also finds error in the ALJ's failure to consider all of the relevant listings for autoimmune disorders, particularly Listings 14.02 for systemic lupus erythematosus ("SLE"), 14.04 for scleroderma[8], and 14.10 for Sjogren's syndrome. Finally, she also argues that the ALJ erred in failing to properly apply the "special technique" required for evaluation of her mental disorders. *See* 20 C.F.R. 404.1520a.

First, an ALJ may rely on opinions of medical experts to determine whether or not a claimant's impairments meet or equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In fact, he is required to do so. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart,* 381 F.3d 664 (7th Cir. 2004). Therefore, the ALJ looked to the opinions of medical experts Dr. Munoz and Dr. Biscardi. (R. 24-25). He noted that both of these experts were familiar with the Listings and the rules of the disability program, had reviewed Plaintiff's medical record in its entirety, and had listened to her testimony at the hearing. (*Id.*). However, with respect to Plaintiff's physical impairments, the ALJ mischaracterized the testimony of Dr. Munoz. The ALJ stated, "Dr. Munoz opined that the claimant's impairments do not meet or medically equal the requirements of any listing." In fact, Dr. Munoz testified only that Plaintiff's impairments do not *meet* a listing. The hearing transcript does not indicate that Dr. Munoz

---

[8] Scleroderma is a rare autoimmune rheumatic disease characterized by thickening of the skin and inflammation and scarring of certain organs. http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Scleroderma (last visited December 16, 2015).

considered the separate issue of whether Plaintiff's impairments together *equal* a listing in severity. (R. 47-48).

In addition to looking to expert testimony, the ALJ also analyzed Plaintiff's medical record in determining that her impairments did not meet or equal a listing. For his step two discussions of listings 1.04 (disorders of the spine), 3.03 (asthma), and 12.04 and 12.06 (mental disorders), he cited specific evidence from the medical record or noted the absence of medical records to support each of his allegations. (R. 25). He also cited significant medical and functional evidence in his lengthy discussion of the impacts of Plaintiff's allergies, fibromyalgia, lupus, asthma, pain, fatigue, mental impairments and history of hypertension in his step five determination. (R. 26-30). *See Clifford*, 227 F.3d at 870. There, he reiterated his reasons for according significant weight to the opinions of Dr. Munoz and Dr. Biscardi. On remand, the ALJ should clarify his reasoning as to why Plaintiff's impairments together did not medically *equal* a listing, given that Dr. Munoz's testimony did not go that far.

Plaintiff also argues that the ALJ failed in his analysis of for Listings 12.04 (affective disorders) and 12.06 (anxiety disorders) to use the "special technique" to assess her mental impairments, as required by 20 C.F.R. 404.1520a. This too is without merit. The technique requires the ALJ to "evaluate the claimant's 'pertinent symptoms, signs, and laboratory findings' to determine whether the claimant has a medically determinable mental impairment." *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008); quoting 20 C.F.R. § 404.1520a(b)(1). The ALJ did this and identified Plaintiff's "depressive disorder with anxiety reaction" among her impairments. Next, if the claimant does have a medically determinable impairment as Plaintiff does here, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R § 404.1520a(b)(2).

Plaintiff argues that the ALJ erred by overlooking the "A" criteria of listings 12.04 (affective disorders) and 12.06 (anxiety disorders). This misreads the listings. To establish the presence of a disorder that meets the severity of Listing 12.04 or Listing 12.06, a claimant must meet both the "A" and "B" criteria of the listing or, in the alternative, the "C" criteria. The "A"

criteria describe symptoms unique to each disorder. Alone, those symptoms are insufficient to establish that a claimant is disabled. The "B" and "C" criteria describe the "degree of functional limitation" required for the disorder to rise to Listings level. 20 C.F.R § 404.1520a(b)(2). Under the "B" criteria, which are identical for the two disorders, at least two of the following must be present: marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* at 12.04.B; 12.06.B.

The ALJ found that Plaintiff is not disabled under either 12.04 or 12.06 because she meets neither the "B" criteria nor the "C" criteria applicable to those listing. The ALJ considered ample evidence in reaching his conclusion. First, as he was required to do, he considered the testimony of medical expert Dr. Biscardi, who opined that the evidence supports a finding of mild restriction of activities of daily living; moderate difficulties with social functioning; moderate difficulties with maintaining concentration, persistence, or pace; and no episodes of decompensation. The ALJ also considered the reports agency consultants Dr. Renzi and Dr. Travis. He also also considered claimant's statements made in her consultative examination and the daily activities reported Plaintiff and by her daughter to further bolster his finding that Plaintiff had only mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 25-26). Because Plaintiff has provided no medical opinion or evidence that she met either the "B" or "C" criteria necessary for a finding of disability under 12.04 or 12.06, the ALJ's reliance on Dr. Biscardi's opinion and on the opinions of the agency experts was appropriate.

Plaintiff also criticizes the ALJ opinion for failing to consider all of the listings relevant to Plaintiff's ailments. In *Rice v. Barnett*, the Seventh Circuit held that an ALJ's failure to specifically mention a listed impairment is not alone a basis for reversal where it is clear from the decision that the ALJ considered each listing raised by the claimant. 384 F.3d 363, 369-370 (7th Cir. 2004). Nor must a court discount a discussion that "provides the necessary detail to review the ALJ's step 3 determination in a meaningful way" solely because it appears in a later

section of the ALJ's opinion. *Curvin v. Colvin,* 778 F.3d 645, 650. "It is proper to read the ALJ's decision as a whole, and… it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five." *Id.* (quoting *Rice,* 384 F.3d at 370, n.5). Remand for failure to cite a particular listing is mandatory only where that failure is is coupled with "an otherwise perfunctory analysis" insufficient to enable "meaningful judicial review." *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003). That is not the case here. While the ALJ did omit any reference to any of the Section 14.00 Listings in his step three discussion, it is clear from the remainder of his opinion that the ALJ considered the Plaintiff's impairments of lupus and fibromyalgia, noting that they did constitute severe impairments and discussing their effects at length in assessing Plaintiff's RFC. (R. 24, 28-29).

More to the point, Plaintiff presents no evidence that her impairments meet listings-level severity for any of the disorders she raises.   To successfully assert she is disabled at step three, a claimant has the burden of proving that she satisfies all of the criteria of a listed impairment. *Rice,* 384 F.3d at 369; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Similar to the listings for mental disorders, the listings for SLE, scleroderma, undifferentiated and mixed connective tissue disease, and Sjogren's syndrome all contain both diagnostic and functional criteria. A claimant's impairment must meet the diagnostic criteria set forth under the specific listing and certain functional criteria applicable to all of them, as set forth in subsection letter "I." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00.I.2. The functional criteria are met when a claimant's disorder or combination of disorders results in a "marked" limitation in one of the three general areas of function: activities of daily living; social functioning; or difficulties in completing tasks due to deficiencies in concentration, persistence, or pace. *Id.*

Plaintiff does point to evidence from the medical record indicating that she meets some of the diagnostic criteria for the autoimmune ailments. (Pl.'s Mem. 6-7). Specifically, she cites numerous laboratory showing elevated anti-nuclear antibodies, which can be associated with both SLE and Sjogren's. (*Id*. at 7). However, Plaintiff has not offered any treatment records or medical opinions indicating that her disorders, together or in combination, cause "marked"

limitation in any of the three relevant areas of functioning, nor has any medical source stated that she meets any listing. A court need not remand the ALJ's step three determination solely for failing to specify a listing when the Plaintiff has not offered evidence showing that she meets all of the criteria of the listings she raises. *See Pahkotama v. Colvin*, No. 10 CV 5379, 2013 WL 2151505 at *11 (N.D. Ill. May 16, 2013) (unpublished.)

C.     **RFC Determination**

At step four, Plaintiff alleges several deficits in the ALJ's assessment of Plaintiff's RFC, resulting in an inadequate "logical bridge" connecting the evidence to the ALJ's conclusions. (Mem. at 10, citing *Craft,* 539 F.3d at 673). First, she claims that the ALJ failed to provide a function-by-function assessment. That is unavailing. It is well-established that an ALJ is not required to articulate a function-by-function RFC analysis. *See*, *e.g.*, *Knox v. Astrue*, 327 Fed.Appx. 652, 657 (7ᵗʰCir. 2009); *Herrera v. Astrue*, 893 F. Supp.2d 933, 942 (N.D. Ill. 2012).

However, when a decision on matters of fact contains serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion. *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir.1996) (citations omitted.) The ALJ made a key error of fact in addressing the evidence of Plaintiff's functional limitations. Although Plaintiff she testified that she can lift "maybe five pounds" and is unable to lift a gallon of juice or milk (R. 64), the ALJ wrote, "the claimant alleges that she could… lift up to 15 pounds." (R. 27). This is a potentially dispositive error. Sedentary work, as defined by the regulations, can require a person to lift up to ten pounds. 20 C.F.R. § 404.1567. If, as Plaintiff alleges, she can never lift a gallon of liquid weighing less than nine pounds,[9] she lacks the functional capacity to perform even sedentary work.

In addition, the ALJ's the ALJ's flawed credibility analysis prevented him from supporting the RFC with reasonable conclusions drawn from Plaintiff's testimony. If, on remand, the ALJ

---

[9] A gallon of milk weighs 8.6 pounds; a gallon of processed juice weighs 8.7 to 8.9 pounds. U.S. Dᴇᴘ'ᴛ. ᴏғ Aɢʀɪᴄ. Eᴄᴏɴ. Rᴇsᴇᴀʀᴄʜ Sᴇʀv., Hᴀɴᴅʙᴏᴏᴋ Nᴏ. 697, Wᴇɪɢʜᴛs, Mᴇᴀsᴜʀᴇs, ᴀɴᴅ Cᴏɴᴠᴇʀsɪᴏɴ Fᴀᴄᴛᴏʀs Fᴏʀ Aɢʀɪᴄᴜʟᴛᴜʀᴀʟ Cᴏᴍᴍᴏᴅɪᴛɪᴇs ᴀɴᴅ Tʜᴇɪʀ Pʀᴏᴅᴜᴄᴛs 1992 at 28, 51, *available at* http://www.ers.usda.gov/media/935958/ah697_002.pdf (last visited December 14, 2015).

finds that Plaintiff was more credible than he initially thought, then he must reconsider the RFC in light of his new assessment.

### D.    Treating Physician

In her criticism of the ALJ's RFC assessment, Plaintiff alleges that "numerous opinions" regarding her condition and limitations that were written by her treating rheumatologist, Dr. Gorgoneata, have been omitted from the ALJ's consideration. If this were true, it would be a serious error, as an ALJ must "offer good reasons for discounting" the opinion of a treating physician. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted). However, the "opinions" that Plaintiff cites are four among many pages of handwritten treatment notes from Plaintiff's visits to Dr. Gorgoneata from 2007 through 2011. None of the notes addresses Plaintiff's capacities or limitations, and three of them pre-date Plaintiff's alleged onset date of January 1, 2009. (R. 440, 442, 445). The one that applies to the relevant time period is difficult to decipher, but does indicate "fibro[myalgia]," "Sjogren's Synd[rome]," "c[omplains] o[f] back pain," and "was trying to walk more going up stairs." (R. 698). How the inclusion of this treatment note would have altered the ALJ's analysis Plaintiff does not explain. The ALJ did not err in failing to give this note great weight.

### E.    Vocational Assessment

Plaintiff also challenges the ALJ's step five determination, arguing that the faulty RFC finding prevented the VE from developing a valid vocational profile. Because this concern flows from the effects of the flawed credibility and RFC assessments already discussed above, the Court need not address it separately.

## CONCLUSION

Plaintiff requests that the Court reverse the decision of the Commissioner of Social Security and order the Commissioner to award benefits, or, in the alternative, to remand the case to the Commissioner with instructions. For the foregoing reasons, the Plaintiff's Motion to Reverse the Decision of the Commissioner [Dkt. 13] is DENIED, her Motion to Remand is GRANTED, and the case is REMANDED to the Administrative Law Judge for further proceedings consistent with this opinion.

ENTER:

_____
DANIEL G. MARTIN
United States Magistrate Judge

DATE:   January 8, 2016.